Criminal Case Template







COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



JOHN B. WALTON, JR.,

                     Appellant/Cross-Appellee,

v.

HOOVER, BAX & SLOVACEK,
L.L.P.,

                     Appellee/Cross-Appellant.

§

§

§

§

§

No. 08-03-00366-CV

Appeal from the

109th District Court

of Winkler County, Texas

(TC#13,201-A)




O P I N I O N
           This case involves a dispute between discharged attorneys and their former client
over a contingent fee contract. John B. Walton, Jr. hired Hoover, Bax & Slovacek, L.L.P.
to represent him regarding certain legal claims.


 Walton later fired HBS, hired new
counsel, and settled his claims for $900,000. HBS sued Walton, claiming entitlement to a
fee of over $1.7 million. HBS asserted that under the termination clause of its agreement
with Walton, Walton owed HBS 28.66 percent of the value of his claims at the time of
termination, regardless of the amount for which he eventually settled the claims.
           Based on the jury’s verdict, the trial court awarded HBS $900,000 in damages,
$140,000 in attorneys’ fees incurred in the preparation and trial of this case, and $8,000
and $10,000, respectively, in attorneys’ fees for appeals to the appellate court and the
supreme court. The court also ordered Walton to pay $247,224.45 in pre-judgment
interest, based on a rate of 6 percent, and set post-judgment interest at the rate of 10
percent.
           Walton appeals, raising six issues. In a cross-appeal, HBS argues that the trial
court should have set both the pre- and post-judgment interest rates at 18 percent. We
conclude that the fee charged by HBS is unconscionable as a matter of law. Therefore,
we reverse and render a take-nothing judgment in favor of Walton.
Factual Summary
Walton’s Hiring of HBS
           Walton owns a ranch in Kermit, Texas that has been in his family since 1910. He
became concerned that the oil and gas companies that have leases on the ranch were
damaging the land and underpaying royalties. Jince Hanson introduced him to Steven
Parrott, an HBS attorney based in Houston. Parrott was an experienced oil-and-gas
lawyer, but was not a trial lawyer. He had previously worked with Hanson.
           Walton testified that he did not interview any other lawyers to pursue his claims,
but Parrott testified that Walton told him that he did interview other lawyers. Parrott also
testified that he initially offered to represent Walton on an hourly fee basis or alternatively
on a hybrid hourly/contingent basis. Walton, however, preferred to pay a straight
contingent fee. Parrott then asked for a 40 percent contingent fee. But when Walton
explained that he had already agreed to give Hanson 10 percent of his recovery, Parrott
agreed to accept 30 percent, since Hanson had introduced him to Walton.
           In June 1995, Parrott and Walton signed an engagement letter, which provided that
HBS would represent Walton on all his claims against the oil and gas companies and that
Walton would compensate HBS as follows:
(A)You assign and convey to the Firm the following present undivided
interest in Your Claims, which interests are hereinafter referred to as
“Contingent Fee”:
 
30% – if settlement or collection is made after the date hereof
and through any first trial, but before the
commencement of a second trial or subsequent trial or
the filing of an appeal by any party to the lawsuit;
 
33% – if settlement or collection is made after the
commencement of a second trial or subsequent trial or
the filing of an appeal by any party to the lawsuit;

. . .
 
(C)In the event any party against whom You have a Claim for surface
damages, conducts . . . surface clean-up . . . or other similar
operations . . . for which You are not compensated by the payment of
cash money, You shall pay the Firm a sum of money equal to 10% of
the estimated fair market value of the expense of such Clean-Up. . . .
 
(D)You shall, contemporaneously with the execution hereof, pay the
Firm a non-refundable retainer fee of $10,000.00 (“Retainer”). The
Retainer shall be credited against the first sums of money recovered
by You . . . , or, at Your election, may be applied by You to the first
non-cash fee obligation You may have to the firm pursuant to
subsection (C) above. . . .

Importantly, the engagement letter included the following termination 

clause:
 
You may terminate the Firm’s legal representation at any time upon
written request to the Firm addressed to my attention. If permission for
withdrawal from employment is required by the rules of a Court, the Firm
shall withdraw upon permission of the Court. Upon termination by You,
You agree to immediately pay the Firm the then present value of the
Contingent Fee described in subsections (A) and (C) above, plus all Costs
then owed to the Firm, plus subsequent legal fees at the rate of $200.00 per
hour of billed time, and Costs, if any, necessarily incurred by the Firm to
facilitate the transfer of representation to any subsequent law firm and/or
for the Firm to withdraw from any litigation. Likewise, the Firm may
withdraw from legal representation of You at any time, and for any reason,
by giving You thirty (30) days advance written notice. In such event You
shall be obligated for Costs which the Firm has incurred on Your behalf; provided, however, the Firm shall be entitled to retain all legal fees and
Costs previously paid by You to the Firm. (Emphasis added.)
Parrott testified that he and Walton “talked about” and “agreed on” the termination
clause. But he also testified that he wrote the engagement letter and chose its words.
           Walton testified that he thought he understood the engagement letter when he
signed it. He had graduated from high school, but had no post-high-school education. 
He was collecting $30,000 to $50,000 per month from the Bass leases. In addition to
owning the ranch, Walton also owned some broadcast stations. He had previously hired
attorneys on a contingent-fee basis.
           After the engagement letter was signed, Walton and Parrott decided that it would
be advisable for Walton to have a local attorney. Parrott testified that he orally agreed to
reduce HBS’s contingent fee to 28.66 percent to facilitate the hiring of Kevin Jackson as
local counsel.
HBS’s Representation of Walton 
           Walton had potential claims against several companies. Parrott settled Walton’s
claim against El Paso Natural Gas for approximately $35,000, and HBS received its 28.66
percent of this settlement. Parrott also settled a claim against Texaco, under which
settlement Texaco paid $175,000 in cash and performed some remediation measures. 
Although HBS received its 28.66 percent of the $175,000, it waived its right to 10 percent
of the estimated fair market value of the cost of the remediation measures. Before Walton
fired HBS, Parrott filed suit against two other companies. Those cases settled after the
termination of representation for a total of $200,000, and Walton paid HBS its contingent
fee.
           In addition to these cases, Walton also had claims against companies controlled by
the Bass Family of Fort Worth. To stop the statute of limitations from running, Parrott
filed suit against the Bass companies soon after the engagement letter was signed. 
Parrott also filed a request for production of documents. He and Walton decided that
before doing a complete audit--which would be expensive--they would hire someone to
do a “spot check” on the documents produced by Bass to determine whether Walton had
viable claims for the underpayment of royalties. Parrott and Walton interviewed several
accounting firms, and on Parrott’s recommendation, Walton hired a C.P.A. named
Edward Holseth to do the spot check. In addition to Holseth’s efforts, Parrott and other
HBS representatives went to Walton’s ranch, and Parrott went to Fort Worth to review
documents. Parrott testified that Walton authorized him to accept $8.5 million to release
his claims against Bass and his royalty interests under the Bass leases. In January 1997,
Parrott made an initial demand on Bass for $58.5 million. Bass’s counsel asked Parrott
how he came up with this amount, and Parrott did not give him an answer.
           In February 1997, Bass made a written response to the $58.5 million demand. 
Bass offered to settle the case for $6 million, with the following conditions: (1) Walton
would dismiss his suit and execute a general release of all his claims; (2) Walton would
convey to Bass his royalty interests under the leases; (3) Walton would grant Bass
easements covering all lands on which its facilities were located; and (4) Walton would
convey to Bass the surface estate of approximately eight sections of the ranch and Bass
would grant Walton a surface lease to use these sections for ranching, subject to any use
Bass wanted to make of them. The sections that Bass wanted to buy constituted several
thousand acres of the ranch.
           Parrott was pleasantly surprised that Bass had offered so much money. Walton,
however, was upset that the offer would require him to sell part of the ranch. Parrott
testified that he told Walton that he believed they could reach a mutually acceptable
agreement with Bass through a series of surface-waiver agreements, surface-damage
agreements, and rights-of-way. According to Parrott, these agreements would accomplish
what Bass wanted to accomplish by buying the land.
           Shortly after Bass made its initial settlement offer, Walton sent a letter to Parrott,
stating that he was “very unhappy with the way this case has been handled.” Walton
further stated that he was unsure as to whether he wanted to sell his royalty interests and
that he wanted to reach a settlement of his claims against Bass before deciding whether to
sell the royalty interests. Walton authorized Parrott to accept $6 million to settle his claim
for underpayment of royalties. He refused to give up “any surface or mineral interest” as
part of a $6 million settlement. Walton also stated that he felt confident that Bass would
reject this offer.Walton’s Termination of HBS
           In March 1997, Walton terminated HBS. Walton testified that he was unhappy
with Parrott’s representation because “[n]othing was being done” on the Bass claims. He
also believed that Parrott should have consulted him before making the $58.5 million
demand. He described that demand as “absurd.” He believed that it caused him to lose
credibility with Bass because a retired Bass employee told him that “[t]hey were falling in
the hallway laughing about it.” On the other hand, Parrott believed that “you can’t ask for
too much money because you don’t know what Bass thinks this case is worth.”
Walton’s Settlement with Bass
           Walton retained another law firm to facilitate a settlement of his claims against
Bass in a manner that would also resolve the dispute between Walton and HBS regarding
HBS’s fees. In July 1997, Bass informed this firm that it was not interested in mediating
the case, “given the numerous allegations of Mr. Walton, the lack of any expert reports or
other evidence supporting the claims, and the amount your client has demanded in
settlement discussions.”
           In September 1997, HBS agreed to represent Walton at a settlement conference or
mediation and Walton agreed to compensate HBS in accordance with subsections (A) and
(C) of the engagement letter if the case settled as a result of the settlement conference or
mediation. But no settlement was reached with Bass, and Bass refused to participate in
mediation. Bass’s counsel sent a letter to local counsel Jackson, explaining its refusal to
participate in mediation. The letter states:
Given the very large gap that remained between the parties after our several
settlement discussions, our clients reasonably believed that formal
mediation would serve no purpose until the Plaintiff could supply legal
theories, facts and calculations supporting the amounts of damages for his
claims. We never received any such information. [We] have been
forthcoming in summarizing our understanding of your client’s claims, and
the Defendants’ opinion of the potential exposure. We never received any
similar explanation from the Plaintiff’s side; rather, we only received
demands for millions of dollars with no statement of plausible legal or
factual bases to justify the demands. Under those circumstances, mediation
was premature.

           In October 1997, Alan Harris with Andrews & Kurth began representing Walton in
his claims against Bass. Harris had been a trial lawyer for twenty years. He testified that
Parrott had done little to develop Walton’s claims. When Harris initially spoke with
Bass’s counsel, he was told that Bass was not interested in settling Walton’s claims
because there was no indication that any of the claims were meritorious. In January 1998,
Harris offered to settle Walton’s claims for $1 million. Bass rejected the offer.
           In March 1998, Bass decided to buy production from a K & N facility near
Walton’s ranch and needed rights-of-way across the ranch to access its facility on the
ranch. Harris viewed this as an opportunity to settle Walton’s claims. He told Bass’s
counsel that he was unhappy that Bass had been ignoring Walton’s claims and that Bass
would have to “get serious” about the claims if it wanted to purchase the rights-of-way. 
In October 1998, Bass offered to settle the claims for $300,000. Harris eventually
negotiated the settlement amount up to $900,000. Without the leverage they obtained as a
result of the K & N transaction, he did not believe that he could have gotten that amount
of money for Walton.
           On November 16, 1998, Walton signed a settlement agreement, which provided
that Bass would pay him $900,000 to settle his claims. On the same day, the parties
entered into an agreement requiring Bass to pay Walton $250,000 in exchange for an
option to acquire rights-of-way over the ranch and $224,000 to acquire initial rights-of-way. In exchange for $50,000, Walton also agreed to give his consent to the transfer of
certain K & N assets and rights-of-way to Bass. Walton paid Andrews & Kurth
$282,780.18 in attorneys’ fees and costs.
 

Value of the Claims at the Time of Termination 
and Determination of HBS’s Fee

           In a January 1998 letter to Walton, Parrott stated that HBS was not willing to wait
to get paid until trial or settlement of Walton’s claims. He also asserted that the case was
worth at least $6 million at the time HBS was terminated because they had a live offer
from Bass for that amount.
           Parrott testified that HBS was seeking 28.66 percent of $6 million. This amounts
to $1,719,600. Parrott contended that under the termination clause, the amount of
Walton’s eventual settlement was irrelevant in determining HBS’s fees; all that mattered
was the value of the claims at the time of termination. He testified, “We’re entitled to be
compensated on what we believe to be the value of the case at the time of termination. 
Just what our contract says.” (Emphasis added.) At another point, he similarly testified,
“Our fee was based on what we believed to be the value of his claims . . . .” (Emphasis
added.) Walton testified that he never agreed to pay HBS a percentage of what Parrott
believed the case was worth. 
           Holseth was paid by HBS to testify at the trial. He testified that Bass “was
cheating Mr. Walton in probably at least ten or twelve different ways . . . .” One of those
ways resulted in Walton’s being shorted approximately $39,000 per month. Holseth
thought Walton’s damages were even more than that amount. Parrott testified that
Holseth believed the underpayments totaled to at least $2 million to $4 million. But he
admitted that Holseth never came up with a firm number for the total amount that Bass
was shorting Walton. Holseth testified that Parrott, Bass, and Walton did not provide him
with all the documents he needed; consequently, he was unable to complete his work. 
Holseth indicated that he had frequent interaction with Parrott and that both of them
worked diligently on the case. Both Parrott and Holseth testified that Holseth was
planning to review more of the documents Bass had produced and do the complete audit
when Walton fired HBS. Around the time that Walton fired HBS, Holseth quit working
for Walton because Walton cursed at him, pressed him to quantify the claims, and
complained about what Holseth was charging for his work.
           Walton testified that although he paid Holseth between $35,000 and $40,000,
neither Parrott nor Holseth ever told him what they thought his claims were worth. 
Holseth told him it would cost $80,000 to come up with a value.
           Bass’s counsel, Robert Grable, testified that Parrott’s initial demand “was so big . .
. I quit listening basically.” He stated that in March 1997, it would have surprised him if
Bass would have been willing to pay even $500,000 simply to settle Walton’s claims
without acquiring any royalty or surface interests. Grable testified that Andrews & Kurth
never amended the petition, never took a deposition, and never designated an expert. But
he also testified that he believed the claims were more developed and posed more of a
threat to Bass in November 1998 (when the settlement was reached) than they did in
March 1997 (when Walton fired HBS). Grable believed that Bass would not have settled
Walton’s claims when it did and at the price it did if not for the K & N transaction. He
stated, “In my opinion, but for the condition Mr. Walton imposed that he would not
consent to the K & N transaction unless the lawsuit were settled, they would not have
paid that much money at that time to settle the lawsuit.”
           Richard Bianchi, a former state district judge from Houston, testified as an expert
witness for HBS. He had the responsibility of approving or disapproving attorneys’ fees
in hundreds of cases. He testified that the 28.66 percent contingent fee was reasonable
and was in fact lower than normal. Regarding whether HBS was attempting to collect an
unconscionable fee, he testified:
It is what they agreed to in their own contract at the time of termination and
if, as in this case, that amount that they agreed to turns out to be higher than
what the case ultimately settled for, they’re really apple and oranges. They
agreed to an assessment at the time of termination and by contract, for
better or for worse, that’s what their deal is.

He also stated that “it would only be unconscionable to ignore the agreement of the
parties.” 
           Local counsel Kevin Jackson testified that the amount sought by HBS would be an
unconscionable fee because it was more than Walton ultimately recovered. He did not
even believe that HBS was entitled to 28.66 percent of the $900,000 that Walton received
in settlement because Parrott did not do the job that a reasonably prudent attorney would
have done. In Jackson’s opinion, Walton had good cause to terminate HBS. He criticized
Parrott for failing to develop the claims against Bass or prepare the case for trial and for
making the $58.5 million demand. He believed that the demand destroyed their
credibility with Bass because Parrott did not have any support for the amount he
requested. According to Jackson, Walton’s claims only had a nuisance value at the time
Walton fired HBS. 
           Like Jackson, Harris testified that Walton had good cause to terminate HBS
because of Parrott’s unauthorized demand of settlement in the amount of $58.5 million. 
Based on his conversations with Bass’s attorney, he believed that the $58.5 million
demand damaged Walton’s credibility.
Procedural Background
           In September 1998, HBS intervened in the suit between Walton and Bass to
recover its attorneys’ fees. The trial court dismissed the suit between Walton and Bass
after they reached their settlement agreement and then severed HBS’s claim. See In re
Hoover, Bax & Slovacek, L.L.P., 6 S.W.3d 646, 649 (Tex. App.--El Paso 1999, orig.
proceeding). HBS sought a writ of mandamus from this Court, seeking to overturn the
severance. Id. We denied the writ, see id. at 652, and the case between HBS and Walton
proceeded to trial before a jury.
           The jury found that Walton did not have good cause to terminate HBS. The charge
required the jury to calculate HBS’s damages by finding “[t]he then present value of
[HBS’s] contingent fee at the time Walton terminated [HBS], on or about March 12,
1997, multiplied by .2866.”


 The jury found HBS’s damages to be $900,000.


 The jury
also found that the fee charged by HBS was not unconscionable. Finally, the jury
determined that HBS’s reasonable and necessary attorneys’ fees incurred in pursuing its
claim against Walton were $140,000 for preparation and trial and $8,000 and $10,000,
respectively, for appeals to the appellate court and the supreme court.
Discussion
           In his first issue on appeal, Walton argues that the fee charged by HBS is
unconscionable as a matter of law. We agree.
           As a general rule, courts have no authority over the fees clients pay their attorneys. 
Thomas v. Anderson, 861 S.W.2d 58, 62 (Tex. App.--El Paso 1993, no writ). The fee is a
matter of contract between attorney and client. Id. But a court will not enforce an
unconscionable fee arrangement. Cf. Restatement (Second) of Contracts § 208
(1981) (stating that a court may refuse to enforce an unconscionable clause of a contract). 
The Texas Disciplinary Rules of Professional Conduct prohibit a lawyer from entering
into an arrangement for, charging, or collecting an unconscionable fee. Tex.
Disciplinary R. Prof’l Conduct 1.04(a), reprinted in Tex. Gov’t Code Ann., tit. 2,
subtit. G app. A (Vernon 1998) (Tex. State Bar R. art. X, § 9). “A fee is
unconscionable if a competent lawyer could not form a reasonable belief that the fee is
reasonable.” Id. Moreover, a lawyer must clearly and accurately explain how the fee is to
be calculated. Id. cmt. 8; see also Levine v. Bayne, Snell & Krause, Ltd., 40 S.W.3d 92,
95-96 (Tex. 2001).
           A client has the right to terminate representation at any time. Tex. Disciplinary
R. Prof’l Conduct 1.15(a)(3) & cmt. 4; see also Charles W. Wolfram, Modern
Legal Ethics § 9.5.2, at 545 (1986) (“It is now uniformly recognized that the client-lawyer contract is terminable at will by the client. For good reasons, poor reasons, or the
worst of reasons, a client may fire the lawyer.”). This right is based on the public policy
of fostering confidence in the legal profession. Clients who have lost confidence in their 
attorneys should not be forced to continue the attorney/client relationship. See Rosenberg
v. Levin, 409 So.2d 1016, 1021 (Fla. 1982); Wolfram, supra, § 9.5.2, at 547; see also
Whiteside v. Griffis & Griffis, P.C., 902 S.W.2d 739, 746 (Tex. App.--Austin 1995, writ
denied) (noting that public policy favors the right of clients to choose their lawyers); Tex.
Disciplinary R. Prof’l Conduct 5.06 & cmt. 1 (limiting agreements that restrict the
rights of lawyers to practice because such agreements also restrict the freedom of clients
to choose their lawyers).
           When a client terminates representation under a contingent-fee contract, the
lawyer’s compensation is determined by whether the client had good cause for the
termination. If the client had good cause, the lawyer may recover in quantum meruit for
services rendered up to the time of termination. Augustson v. Linea Aerea Nacional-Chile S.A., 76 F.3d 658, 662 (5th Cir. 1996) (applying Texas law); Rocha v. Ahmad, 676
S.W.2d 149, 156 (Tex. App.--San Antonio 1984, writ dism’d). But if the client
terminated the representation without good cause, the lawyer is not limited to quantum
meruit. The lawyer may also recover on the contingent-fee contract. Mandell & Wright
v. Thomas, 441 S.W.2d 841, 847 (Tex. 1969); see also Augustson, 76 F.3d at 662; Law
Offices of Windle Turley, P.C. v. French, 140 S.W.3d 407, 413 (Tex. App.--Fort Worth
2004, no pet. h.). This means that if a client discharges a law firm without good cause,
the firm may collect its entire contingency fee from the client’s eventual recovery. See
Mandell & Wright, 441 S.W.2d at 847.



           The parties may alter the above rules by providing in the fee agreement for the fee
that will be paid upon discharge, as long as the fee is reasonable in light of the work
performed. Laws. Man. on Prof. Conduct (ABA/BNA) 41:116 (Dec. 13, 1995). Because
of the public policy favoring the right to choose counsel, however, a fee agreement may
not provide for a fee upon discharge that penalizes the client for deciding to change
counsel. AFLAC, Inc. v. Williams, 444 S.E.2d 314, 317 (Ga. 1994); Florida Bar v. Doe,
550 So.2d 1111, 1113 (Fla. 1989).
           In addition to the right to change counsel, clients also have the right to decide
whether to accept a settlement offer. Tex. Disciplinary R. Prof’l Conduct 1.02(a)(2). 
Consequently, a fee agreement may not contain a provision that infringes on this right. 
Laws. Man. on Prof. Conduct, supra, 41:118.
           In this case, the termination clause required Walton “to immediately pay [HBS] the
then present value of the Contingent Fee” if Walton terminated HBS’s representation. 
Based on this clause, HBS demanded, or charged, a fee of $1,719,600--over $800,000
more than the amount Walton received pursuant to his settlement agreement with Bass. 
See Comm’n for Lawyer Discipline v. Eisenman, 981 S.W.2d 737, 741 (Tex. App.--Houston [1st Dist.] 1998, pet. denied) (defining “charge” in the context of Disciplinary
Rule 1.04(a) as “to ask payment of”). Although the jury did not award HBS $1.7 million,
it did award the firm $900,000--100 percent of the settlement amount and approximately
63 percent of the total amount that Walton received from Bass.



           In evaluating HBS’s fee, we begin with this most obvious point: HBS demanded
more than the total amount that Walton received from Bass and was awarded 100 percent
of the settlement amount. Walton argues that a 100 percent contingency fee is per se
unconscionable. Relying on our opinion on its petition for writ of mandamus, HBS
counters that its fee was not a contingency fee, but a “buy-out fee.” We held in our
earlier opinion that the termination clause “requires Walton to ‘buy out’ HBS’s interest in
the cause of action should Walton choose to terminate HBS’s services.” In re Hoover,
Bax & Slovacek, 6 S.W.3d at 651.
           Although the cost of the “buy-out” is calculated by determining the present value
of the contingent fee, we agree with HBS that its fee was not a true contingent fee
because it was not dependent upon the outcome of the case. See Tex. Disciplinary R.
Prof’l Conduct 1.04(d); Eisenman, 981 S.W.2d at 741; see also Restatement (Third)
of the Law Governing Lawyers § 35 cmt. a (2000); Wolfram, supra, § 9.4.1, at 526. 
But we do not agree with the implication that a 63 percent-100 percent “buy-out fee” is
more justifiable than a 63 percent-100 percent contingent fee. Their dependent nature is
what justifies large contingent fees; the potential to earn large fees compensates attorneys
for the risk that they will receive nothing if a case is lost. Arthur Andersen & Co. v. Perry
Equip. Corp., 945 S.W.2d 812, 818 (Tex. 1997). The fee provided for in the termination
clause was divorced from this risk. Under its interpretation of the termination clause,
HBS was entitled to a percentage of the value of the case, regardless of the amount that
Walton received from a judgment or settlement. HBS actually received more upon
termination than it would have if it had not been fired and had represented Walton in the
eventual settlement. Thus, the justification for allowing a large percentage fee does not
apply to the so-called “buy-out fee.”
           HBS also argues that under other types of fee arrangements, such as hourly
charges and nonrefundable retainers, clients may end up paying more in attorneys’ fees
than they recover. Such fees, like all fees, are reviewable for their reasonableness and
may be found unconscionable if they are excessive under the circumstances of a particular
case. In any event, HBS’s fee in this case is different from hourly and retainer fees in that
it bears no relation to the consideration provided by HBS. Hourly fees are based on the
value of the time the attorney spends on the client’s case. Retainers are based on the
income lost and the costs incurred by an attorney who agrees to be on call to handle the
client’s legal matters. See Restatement (Third) of the Law Governing Lawyers §
34 cmt. e (2000); Wolfram, supra, § 9.2.2, at 506. In appropriate cases, large hourly or
retainer fees are permissible based on the amount of time the lawyer reasonably spent on
the case or on the income lost and costs incurred by the lawyer. HBS’s fee, however, was
not based on any of these considerations.
           In short, the fee charged in this case was not based on the value of the work
performed, nor was it tied to Walton’s actual recovery. Under these circumstances,
allowing a discharged law firm to collect a fee equaling 63 percent-100 percent of its
former client’s recovery would violate public policy by penalizing the client for
discharging the firm. See Doe, 550 So.2d at 1111-13 (disapproving of a termination
clause that required the client to pay the greater of $350 per hour or 40 percent of the
greatest gross amount offered in settlement because the effect of the clause was to
penalize the client for exercising the right to fire the attorney). The termination clause is
similar to an unenforceable liquidated damages provision. See Phillips v. Phillips, 820
S.W.2d 785, 788 (Tex. 1991) (holding that a liquidated damages provision is an
unenforceable penalty unless the actual damages are difficult to estimate and the
liquidated damages are a reasonable forecast of just compensation); see also
Restatement (Second) of Contracts § 208 cmt. e (1981) (stating that unreasonably
large liquidated damages are not recoverable because they are unconscionable).
           HBS’s principal argument as to why it is entitled to a $900,000 fee is that the
termination clause seems to allow this result. HBS’s expert echoed this argument when
he testified that the parties “agreed to an assessment at the time of termination and by
contract, for better or for worse, that’s what their deal is.” To accept HBS’s argument
and its expert’s testimony would eviscerate the rule prohibiting unconscionable fees. The
rule presupposes that the parties may have “enter[ed] into an arrangement for” the fee. 
See Tex. Disciplinary R. Prof’l Conduct 1.04(a); see also Restatement (Third) of
the Law Governing Lawyers § 34 cmt. a (2000) (stating that an unreasonable fee will
not be enforced even if the parties agreed to it). As one judge has noted, “[W]hen
construing contracts between lawyers and clients, it is not enough to simply say that a
contract is a contract. There are ethical considerations overlaying the contractual
relationship.” Lopez v. Muñoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 868 (Tex.
2000) (Gonzales, J., concurring and dissenting).
           HBS’s contractual argument is particularly misplaced in this case because the
termination clause does not contain any explanation as to how the “present value of the
Contingent Fee” was to be determined.


 Assuming, as HBS has argued, that the clause
should be interpreted to require Walton to pay 28.66 percent of the value of his claims at
the time of termination, the engagement letter provides no method for valuing Walton’s
claims. For example, was the value to be determined by settlement offers? If so, how
would the value be determined if there were no settlement offers at the time of
termination? Would the value be based on Holseth’s calculations? What if Holseth had 
not made any calculations at the time of termination?
           Parrott’s testimony indicates that the present value of the contingent fee was
whatever HBS said it was. He testified, “Our fee was based on what we believed to be
the value of his claims . . . ” and that “[w]e’re entitled to be compensated on what we
believe to be the value of the case at the time of termination.” (Emphasis added.) 
Walton, however, did not understand that he had agreed to have the fee determined by
what Parrott believed the claims were worth. An agreement that leaves the damages to be
paid upon termination by one party wholly within the unfettered discretion of the other
party is so one-sided as to be substantively unconscionable. See In re Palm Harbor
Homes, 129 S.W.3d 636, 645 (Tex. App.--Houston [1st Dist.] 2003, orig. proceeding)
(mand. filed) (recognizing that substantive unconscionability focuses on the one-sidedness of the transaction).
           Moreover, Parrott’s opinion that the claims were worth at least $6 million was
based in part on Bass’s $6 million settlement offer. Requiring Walton to pay a fee
derived from this amount would effectively penalize him for refusing the settlement offer. 
See Laws. Man. on Prof. Conduct, supra, 41:118 (fee agreement may not require the
client to pay a fee based on the larger of a proffered settlement amount or the amount
recovered at trial).
           We recognize that the question of unconscionability was submitted to the jury and
the jury determined that HBS had not charged an unconscionable fee. But under the
unusual and undisputed facts of this case, we agree with Walton that for reasons of public
policy the fee charged by HBS was unconscionable as a matter of law.
           This opinion should not be read to infringe upon the rights of discharged attorneys
to be compensated for their work or upon the freedom of attorneys and clients to agree
upon a reasonable compensation for a discharged attorney. We simply hold that when a
fee: (1) is paid to a law firm that was discharged over a year and a half before settlement
of the case; (2) equals 63 percent-100 percent of the former client’s recovery; (3) is not
tied to the work performed or the risk incurred by the firm; (4) arises from an agreement
that does not clearly and accurately explain how the fee is to be calculated; (5) allows the
discharged attorneys unfettered discretion in determining the value of their fee; and (6) is
derived in part from a settlement offer rejected by the client, the fee operates as a penalty
for termination and refusal of settlement. As such, it is unconscionable as a matter of law
and public policy.
           HBS asserts that Walton ratified the engagement letter by accepting the benefits of
HBS’s representation on his non-Bass claims and by paying HBS’s fees from the
settlements he received on those claims. HBS did not assert ratification in the trial court,
and the issue cannot be raised for the first time on appeal. See Zuniga v. Allstate Ins. Co.,
693 S.W.2d 735, 739 (Tex. App.--San Antonio 1985, no writ). Furthermore, a
contractual provision that violates public policy cannot be ratified. See Mercury Life &
Health Co. v. Hughes, 271 S.W.2d 842, 846 (Tex. Civ. App.--San Antonio 1954, writ
ref’d); Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc., 779 S.W.2d 474, 478
(Tex. App.--El Paso 1989, writ denied); Ussery v. Hollebeke, 391 S.W.2d 497, 502 (Tex.
Civ. App.--El Paso 1965, writ ref’d n.r.e.).
           Having concluded that HBS may not recover the $900,000 fee under the
termination clause, we must determine whether HBS is entitled to any recovery under an
alternate theory. As explained above, a law firm discharged without good cause may
recover on its fee agreement or in quantum meruit. Although HBS pleaded quantum
meruit in the trial court, quantum meruit was not submitted to the jury as an alternate
ground of recovery. Instead, the jury was instructed to answer questions regarding
quantum meruit only if it found that Walton had good cause to fire HBS. HBS did not
object to this part of the charge or request that the jury be required to answer the quantum
meruit questions. Moreover, HBS did not present any evidence on the reasonable value
of its services. And HBS has not prayed for a remand on its quantum meruit claim in the
event that we reversed the trial court’s judgment. Under these circumstances, we will not
remand for a new trial on the quantum meruit claim. See PIC Realty Corp. v. Southfield
Farms, Inc., 832 S.W.2d 610, 616 (Tex. App.--Corpus Christi 1992, no writ); cf. Tex. R.
Civ. P. 279; Kittyhawk Landing Apartments III v. Anglin Constr., 737 S.W.2d 90, 93-94
(Tex. App.--Houston [14th Dist.] 1987, writ ref’d n.r.e.).Conclusion
           For the reasons stated herein, we sustain Walton’s Issue 1.A and reverse the
judgment of the trial court. Having found no basis for a remand, we render judgment that
HBS take nothing from Walton. Given this disposition, we find it unnecessary to address
Walton’s remaining issues or the issue raised in HBS’s cross-appeal. 
 
                                                                  SUSAN LARSEN, Justice
October 14, 2004

Before Panel No. 1
Larsen, McClure, and Chew, JJ.